UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**TERRY SEETON**,                                    Case No. 5:11 CV 761

                        Plaintiff,                  Magistrate Judge James R. Knepp, II

            v.                                      MEMORANDUM OPINION AND ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

                        Defendant.

### INTRODUCTION

Plaintiff Terry Seeton appeals the administrative denial of Disability Insurance Benefits

(DIB) and Supplemental Security Income (SSI) under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c),

respectively. The district court has jurisdiction over this case under 42 U.S.C. § 405(g) and

§ 1383(c)(3). The parties consented to the exercise of jurisdiction by the undersigned in accordance

with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 19). For the reasons given below, the Court affirms

the Commissioner's denial.

### BACKGROUND

Plaintiff filed applications for DIB and SSI on December 8, 2005, alleging a disability onset

date of December 15, 2003. (Tr. 67–69, 77–80). His applications were denied initially (Tr. 64–66)

and upon reconsideration (Tr. 57–59). Plaintiff then requested a hearing before an Administrative

Law Judge (ALJ). (Tr. 54–56). Born in 1959, Plaintiff was 48 years old at the time of the ALJ's

hearing. (Tr. 67, 77).

Medical History

Plaintiff's primary medical issues giving rise to his applications for benefits stem from his

psychological symptoms, bladder cancer, and systemic pain. Plaintiff suffered a lifting injury to his

back in 1993. (Tr. 271). Chiropractic records from the late 1990s indicate Plaintiff has "a whole person impairment of 25%" caused by herniated discs and hip motor loss. (Tr. 193U–193V).

Plaintiff's primary care physician has been internist Anthony Finizia, M.D. He began seeing Dr. Finizia in July 2005, at which point Dr. Finizia found no paraspinal spasms, normal muscle tone, and 5/5 strength in Plaintiff's lower extremities. (Tr. 384). He also ordered a battery of medical imaging tests including a pelvis CT scan, which ultimately revealed a cancerous bladder neoplasm. (Tr. 430–435). This tumor was surgically resected in August 2005, after which a cytoscopy with bladder biopsy showed no evidence of disease and Plaintiff began a course of six BCG chemotherapy treatments. (Tr. 401, 410). Several subsequent surveillance cytoscopies were conducted, each showing no evidence of recurrence, and Plaintiff continued his chemotherapy through August 2006. (Tr. 333–334, 342–344, 411–413, 416–418, 422–423).

Plaintiff continued to see Norman Lefkovitz, M.D. – from whom he received treatment for back pain in the late 1990s (Tr. 192–193I) – for pain management beginning in August 2005. (Tr. 195, 207–209, 236, 290–291, 322–324, 372–378). While Dr. Lefkovitz's hand-written records from this time are mostly illegible (Tr. 208, 290–291, 322–323, 372–374, 380–381), it is decipherable that he consistently treated Plaintiff with methadone, among other medications, to control Plaintiff's pain. (Tr. 195, 207–209, 236, 291, 324, 375–378).

Meanwhile, after Plaintiff's bladder surgery, he presented to Dr. Finizia with anxiety and panic symptoms relating to the procedure, at which time he was prescribed Valium. (Tr. 402–403). Plaintiff's anxiety continued to worsen, and Dr. Finizia added Zoloft in November 2005. (Tr. 411–412). A few months later, when Plaintiff complained of increased depression, Dr. Finizia increased his Zoloft dosage. (Tr. 331).

2

At a followup in April 2006, Plaintiff complained of low back pain radiating down his left leg. (Tr. 305–306). Dr. Finizia ordered an x-ray of the lumbar spine, which revealed an intervertebral disc space narrowing at L5-S1 with minimal anterior vertebral endplate spurring, as well as degenerative facet hypertrophy at L4-L5. (Tr. 316). The radiologist interpreting this scan recorded an impression of a "[m]ild degenerative change within the lumbar spine". (Tr. 316). Dr. Finizia deferred treatment of Plaintiff's pain to his pain management specialist, Dr. Lefkovitz. (Tr. 306).

In June 2006, Plaintiff complained of bilateral knee pain, and on examination Dr. Finizia noted small effusions but otherwise no problems and a full passive range of motion. (Tr. 336–337). Not long thereafter, Plaintiff complained of muscle aches throughout the day, four days a week, but Dr. Finizia reported improved control of Plaintiff's anxiety. (Tr. 340–341).

In September 2006, following abnormal liver function tests, Plaintiff underwent an ultrasound of the right upper quadrant. (Tr. 330). This revealed increased echogenicity of the liver, determined to be hepatomaegaly with diffuse fatty infiltration of a moderate degree. (Tr. 330). Dr. Finizia later attributed Plaintiff's difficulty exercising to pain from his liver disease. (Tr. 269).

Toward the end of 2006, Plaintiff complained to Dr. Finizia of diffuse weakness and pain – stating he was in pain "from head to toe" – and occasional unsteadiness from his knee giving out. (Tr. 264). Dr. Finizia noted Plaintiff had stopped all therapy, surveillance, and interventions regarding his bladder cancer. (Tr. 264). Dr. Finizia recommended a referral for pain, a psychological evaluation, and a urological evaluation for his bladder, but Plaintiff declined all three recommendations. (Tr. 265).

In June 2007, Dr. Finizia completed an RFC assessment. (Tr. 283–285). In it, he listed Plaintiff's medical conditions as low back pain, myalgia/myositis, bladder neoplasm, anxiety,

3

depression, fatty liver, insomnia, and gastroesophageal reflux disease. (Tr. 283). He determined Plaintiff could stand, walk, or sit for less than one hour in an eight-hour workday, and for less than one hour without interruption. (Tr. 284). He also determined Plaintiff could only lift or carry five pounds frequently or occasionally. (Tr. 284). Dr. Finizia reported Plaintiff has marked limitations in pushing, pulling, bending, reaching, handling, and performing repetitive foot movements. (Tr. 284). He reportedly based these RFC findings on a physical examination of, and discussion with, Plaintiff. (Tr. 284).

By mid-summer 2007, Plaintiff had weaned himself off Zoloft. (Tr. 271). Within a few months, his anxiety and depression had worsened, and he agreed to restart Zoloft. (Tr. 256). However, Plaintiff never filled the prescription, and in November 2007, Plaintiff refused Zoloft outright. (Tr. 258).

At a February 2008 followup, Plaintiff complained to Dr. Finizia of right shoulder pain, stating his pain could be "way over a ten", but declined a referral to physical therapy. (Tr. 239). Plaintiff then underwent an ultrasound of his right shoulder in March 2008. (Tr. 215–217). This revealed "no significant abnormality", including no fracture, dislocation, erosive or destructive changes, osteolytic or osteoblastic lesions, or pathological calcifications. (Tr. 215). A bladder and kidney ultrasound taken at the same time did not confidently identify the previously-seen bladder mass. (Tr. 217). Although the ultrasound was normal, Dr. Finizia highly recommended Plaintiff be reevaluated by a urologist to determine if his cancer had returned. (Tr. 214).

In July 2008, Plaintiff declined a recommended CT scan from the chest to the pelvis in order to investigate the cause of his weight loss. (Tr. 205). The following month, Plaintiff declined an abdominal CT scan stating he did not want to know if he had cancer. (Tr. 200). He later declined

again despite being told his weight loss could mean his cancer had returned. (Tr. 443).

Plaintiff's RFC has been evaluated by several consultants since applying for benefits. In April 2006, consultant psychologist Bruce Goldsmith, Ph.D., assessed Plaintiff's RFC. (Tr. 356–368). Dr. Goldsmith determined Plaintiff's adjustment disorder with mixed emotional features is not severe. (Tr. 356, 359). He determined Plaintiff has only mild limitations in his activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. (Tr. 366). Dr. Goldsmith attributed Plaintiff's anxiety symptoms to factors other than mental illness; he reported the evidence does not show Plaintiff "would have a severe psychological impairment in the absence of his cancer" and stressful financial situation. (Tr. 368). Consultant psychologist Karen Stailey-Steiger, Ph.D later reviewed and affirmed this assessment. (Tr. 297).

In May 2006, medical consultant Walter Holbrook, M.D. assessed Plaintiff's physical RFC. (Tr. 348–355). Dr. Holbrook determined Plaintiff could lift ten pounds frequently, 20 pounds occasionally, and could sit, stand, or walk for about six hours in an eight-hour workday. (Tr. 349). He characterized Plaintiff's ability to push or pull as unlimited, and found no other physical limitations. (Tr. 349–352). Dr. Holbrook relied on records showing no spasm, normal muscle tone, 5/5 strength in the lower extremities, normal sensation, and normal gait. (Tr. 349). He deemed Plaintiff's allegations "mostly credible", but said his "[b]ladder cancer will not last", his back impairment does not meet a listing, and there is "no evidence of current severe shoulder limitations." (Tr. 353). Medical consultant Myung Cho, M.D. later reviewed and affirmed this assessment. (Tr. 296).

In March 2008, consultant psychologist Joan Williams, Ph.D. reviewed Plaintiff's medical

5

records to assess his mental RFC. (Tr. 232- 233). Dr. Williams reported Plaintiff's records "do not show the pervasive, global depressive interpretations and attributions that tend to appear in incapacitating depressions." (Tr. 233). She concluded "[t]he evidence does not reflect a basis for modifying" Dr. Goldsmith's earlier psychological assessment. (Tr. 233).

Dr. Holbrook reviewed Plaintiff's records again in April 2008 to make a second physical RFC assessment. (Tr. 224–231). Once again, he determined Plaintiff could lift ten pounds frequently, 20 pounds occasionally, and could sit, stand, or walk for about six hours in an eight-hour workday with an unlimited ability to push or pull. (Tr. 225). He noted an October 2006 biopsy showed no evidence of Plaintiff's cancer, saying "[h]e was successfully treated with BCG." (Tr. 225). In addition to the physical findings Dr. Holbrook relied on before, this time he also mentioned Plaintiff declining physical therapy, an unclear diagnosis regarding Plaintiff's complaints of general myalgias, and no evidence of recurrent shoulder dislocation. (Tr. 225–226).

<u>Administrative Hearing</u>

Plaintiff appeared with counsel at a teleconference hearing before the ALJ on September 24, 2008. (Tr. 482). Plaintiff testified he was formerly married and has two adult children, but is now divorced. (Tr. 484, 489). He explained he currently lives with a lady who lets him stay with her because he "doesn't have anywhere else to stay." (Tr. 489). Vocationally, Plaintiff testified he did not graduate from high school, but has a GED. (Tr. 483). He previously worked in a steel mill, as a self-employed handyman, as a painting crew supervisor, and most recently at a carpet store. (Tr. 484). Plaintiff testified he stopped working as a painting crew supervisor because business slowed; as a handyman because of his back pain; and at the carpet store because the business ran into problems. (Tr. 485, 490). However, Plaintiff said he would not have been able to continue working

even if the carpet store business had not run into problems because his leg was going numb from sitting too long. (Tr. 490).

Plaintiff discussed his medical problems in depth. He said his shoulder goes numb if he "uses it too much", and both of his shoulders dislocate if he lifts his arms too high. (Tr. 485). Doctors have recommended surgery to lock his left arm to the side, but Plaintiff said he declined because it is his dominant arm. (Tr. 484). In addition, Plaintiff testified he has back pain from deteriorating and herniated discs (Tr. 486), he has had two bladder surgeries because of cancer (Tr. 494), and he has no reflex in his left ankle or foot due to a pinched nerve (Tr. 515). He said he wakes up in the night because of back and bladder pain. (Tr. 494).

With respect to his bladder cancer, Plaintiff testified he underwent chemotherapy once a week for a year after his surgery, which caused him to "pretty much do nothing but sleep". (Tr. 503). Plaintiff testified his physicians discontinued his post-surgery chemotherapy treatments because of complications. (Tr. 495). Plaintiff has since refused additional treatments relating to his bladder because he does not want to know if his cancer has returned, even though he said he lost around 100 pounds within the five months prior to the hearing. (Tr. 499–500).

Plaintiff appeared at the hearing with a cane and testified he has used it intermittently since 1993. (Tr. 491). He uses it with both hands and switches when one side becomes sore. (Tr. 491). However, Plaintiff testified his cane causes pain to radiate down both legs. (Tr. 487). Plaintiff said he does not want to commit suicide, but if he did it would be because of his pain. (Tr. 499). According to his testimony, he has been in pain since age thirteen, when his shoulder first started dislocating. (Tr. 499). Plaintiff testified "it hurts everywhere", but his shoulders and back are the worst. (Tr. 499–500). He currently takes methadone and Valium for his pain because he cannot

7

afford morphine. (Tr. 492).

Plaintiff testified about his residual abilities. He said the heaviest thing he can lift or carry occasionally is a gallon of milk, but "it hurts". (Tr. 490). He testified he has difficulty standing in one place for more than a few minutes and difficulty sitting for more than ten minutes. (Tr. 490–491). Plaintiff estimated he could walk a quarter mile but the furthest he actually walks is down the driveway and past a couple houses. (Tr. 491, 493). Plaintiff said his most comfortable position is lying on his side. (Tr. 491).

On an average day, Plaintiff watches television, does laundry, dries dishes, prepares meals, takes short walks outside, and does stretching exercises. (Tr. 492, 494). He also cleans his room and tries to help around the house. (Tr. 493–494). Other than walking, Plaintiff said he leaves the house when he drives to the grocery store once every two weeks. (Tr. 493).

Also appearing at the hearing was vocational expert (VE) Ted Macy, who classified Plaintiff's job at the carpet store as light, semiskilled work; as a handyman as medium, semiskilled work; and at the steel mill as heavy to very heavy. (Tr. 505). The VE characterized Plaintiff's work as a painting crew supervisor as an accommodated light job – "much lighter than a normal painting supervisor". (Tr. 505).

The ALJ posed a hypothetical question to the VE, asking him to assume a younger individual with a twelfth-grade education and Plaintiff's past work experience, with the following further limitations: can lift and carry no more than ten pounds occasionally and lesser amounts more frequently; can sit, stand, or walk for four hours out of an eight-hour workday; cannot climb ladders, ropes, or scaffolds; cannot crouch, crawl, or kneel; cannot perform overhead work with the dominant left extremity; and is limited to simple, routine tasks. (Tr. 506–507). In response, the VE testified

8

such an individual could not perform any of Plaintiff's past relevant work, and would be limited to sedentary jobs. (Tr. 507). However, the VE opined such an individual could perform the jobs of bench assembler, wire worker, and final assembler, each of which accounts for hundreds of positions in the regional economy. (Tr. 507–508).

The VE was asked further questions about these three examples. He said if such an individual were absent three days a week, he could not perform any of these jobs absent a special accommodation, and would otherwise be unemployable. (Tr. 509). Some employers, the VE said, would tolerate two absences a month, but many would even find this unacceptable. (Tr. 509). Additionally, the VE said that if the individual could only use his hands occasionally, most of these jobs would be impossible. (Tr. 512). On cross examination, the VE was asked about methadone, and replied that methadone can affect people's alertness and could therefore possibly increase an employer's liability because an individual taking methadone could injure himself or someone else. (Tr. 514).

The Commissioner's Decision

The ALJ issued an unfavorable decision on December 30, 2008. (Tr. 11–23). He found Plaintiff met the insured status requirement for DIB through December 31, 2003, but has no impairments that meet or equal a listing and is still capable of performing ample work in the regional economy. (Tr. 16–23). Thus, he found Plaintiff not disabled. (Tr. 23). Plaintiff requested review (Tr. 9), but the Appeals Council denied review on March 22, 2011 (Tr. 2) after incorporating new evidence into the record (Tr. 6), making the ALJ's denial the final decision of the Commissioner.

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the

9

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. §§ 1382(a)(1), 423(a)(1)(E). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

10

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The Court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)–(f), 416.920(b)–(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff now challenges the ALJ's decision on three grounds, arguing the ALJ (1) failed to properly assess Plaintiff's mental impairments; (2) failed to evaluate Plaintiff's credibility under the proper legal standards; and (3) failed to accord appropriate weight to the opinions of Plaintiff's treating physician, Dr. Finizia. These arguments are addressed in turn.

Mental Impairments

Plaintiff argues the ALJ failed to properly assess Plaintiff's mental impairments. Essentially, Plaintiff argues the ALJ's RFC is unsupported by substantial evidence in that it should have been more restrictive to accommodate his depression and anxiety. The Commissioner construes Plaintiff's argument to be a step two argument about the ALJ's failure to label anxiety and depression as severe

11

impairments, but such an argument would lack merit because the step two inquiry is merely a threshold inquiry. *See, e.g., Pompa v. Commr's of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence."). "After an ALJ makes a finding of severity as to even one impairment, the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (quoting SSR 96-8p, 1996 WL 374184, at *5).

As the Commissioner points out, because the ALJ found at least one severe impairment at step two (Tr. 16), the relevant inquiry here is whether the ALJ properly considered and evaluated the record evidence concerning all of Plaintiff's medically determinable impairments – severe or not – in assessing his RFC. *See* 20 C.F.R. § 404.1545(a)(2). The ALJ's RFC included a limitation to "simple, routine tasks" as the only accommodation for Plaintiff's mental impairments. (Tr. 18). In making this determination, the ALJ noted Plaintiff "told treating sources in August 2006 that Valium was controlling his anxiety". (Tr. 19). After summarizing other medical records, the ALJ concluded, "[t]here is nothing in the record that convinces me that any further reduction in the residual functional capacity I have assessed would be justified." (Tr. 21).

The record provides substantial support for the ALJ's mental RFC. Dr. Finizia's records show Plaintiff's limited psychological treatment was mild in severity, his symptoms were well-controlled by medication, and Plaintiff routinely refused further psychological evaluation. In August 2006, Dr. Finizia reported improved control of Plaintiff's anxiety and no further anxiety attacks. (Tr. 340). In February 2007, Dr. Finizia again reported stable control of Plaintiff's anxiety; at that

12

time, Plaintiff reportedly stated his medications were working. (Tr. 268). By June 2007, Plaintiff weaned himself off Zoloft on his own initiative (Tr. 271), although he later agreed to restart it after his anxiety and depression increased (Tr. 255). In August 2008, Plaintiff told Dr. Finizia that Valium was calming him down and he "has it together". (Tr. 197). These facts show Plaintiff's anxiety and depression have been controlled by medication, supporting the conclusion that no significant RFC restriction is necessary to accommodate these impairments. *See* 20 C.F.R. § 404.1529(c)(3)(iv) (permitting consideration of the effectiveness of medication in alleviating pain or other symptoms in order to assess the severity of symptoms). Also, throughout Dr. Finizia's encounters with Plaintiff, he has regarded Plaintiff as "interactive and nontoxic", suggesting his mental impairments do not impede his ability to interact with others. (Tr. 197, 202, 238, 257, 264, 271, 305, 336, 338, 340, 384, 387, 402, 411, 415, 442).

Furthermore, Plaintiff refused a psychological evaluation on multiple occasions (Tr. 201, 265, 384) and at one point declined an SSRI for his anxiety (Tr. 257–258). In addition, consultant psychologist Dr. Goldsmith determined Plaintiff has no more than mild restrictions in any functional area, and those restrictions are only a result of the stress caused by Plaintiff's cancer. (Tr. 366, 368). These facts amount to substantial support for the ALJ's determination that no restriction beyond a limitation to simple, routine tasks is needed in Plaintiff's RFC. The Court cannot say the ALJ erred in assessing Plaintiff's mental RFC.

Plaintiff argues the ALJ should have focused on the impairments diagnosed by Dr. Finizia. As demonstrated by the above facts, the ALJ did not err in his examination of Dr. Finizia's records with respect to Plaintiff's mental impairments. The ALJ's analysis of Dr. Finizia's records in the context of Plaintiff's physical impairments is discussed below, when addressing Plaintiff's

contention that the ALJ erred in his treatment of Dr. Finizia's opinion evidence.

Credibility

Plaintiff argues the ALJ failed to follow the dictates of SSR 96-7p in assessing Plaintiff's credibility. The Ruling requires an ALJ to "consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms . . . and any other relevant evidence in the case record" when determining the credibility of a claimant's statements. SSR 96-7p, 1996 WL 374186, at *1. On review, that is precisely what the ALJ did, and his conclusions have the support of substantial evidence in the record.

The "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). An ALJ's credibility determinations about the claimant are to be accorded "great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters*, 127 F.3d at 531); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("[W]e accord great deference to [the ALJ's] credibility determination."); *Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987) ("the ALJ made an adverse credibility finding, and given his opportunity to observe the claimant, his conclusions should not lightly be discarded"). While it is up to the Commissioner to make credibility findings, an ALJ making an adverse credibility determination must clearly state his reasons for doing so. *Auer v. Sec'y of Health & Human Servs.*, 830 F.2d 594, 595 (6th Cir. 1987).

In this case, the ALJ determined Plaintiff's statements concerning the intensity, persistence,

14

and limiting effects of his symptoms are not credible to the extent they disagree with the ALJ's RFC. (Tr. 18). To support this adverse credibility finding, the ALJ cited a plethora of facts, among them: Plaintiff's x-rays only show mild degenerative changes; Plaintiff has refused referral to a urologist; Plaintiff told treating sources his anxiety was controlled; Plaintiff's admitted activities of daily living "are not as limited as one would expect"; Plaintiff has a history of "extreme noncompliance taking prescription medication" and adhering to medical advice; Plaintiff apparently stopped working for reasons unrelated to his alleged disability; and the evidence does not show Plaintiff's cane or brace are medically necessary or have been prescribed. (Tr. 19–20).

On review, the ALJ's adverse credibility determination is supported by substantial evidence in the record. Just as the ALJ said, the transcript is replete with evidence of Plaintiff's noncompliance with medical advice and prescription medications – even disregarding Plaintiff's refusal to seek treatment for his bladder cancer (Tr. 199, 204, 239, 256–257, 264–265, 272, 443), which Plaintiff argues should not be used to support an adverse credibility finding. Aside from that, Plaintiff refused a psychological evaluation three times. (Tr. 199, 265, 385). He never made appointments for a recommended arthritis evaluation despite his complaints of knee pain (Tr. 338) or for pain management at a particular clinic despite a decreased cost that would have allowed him access to medications he could not otherwise afford (Tr. 264, 268). Plaintiff weaned himself off Zoloft without orders to do so (Tr. 271), then agreed to restart Zoloft (Tr. 255) but never filled the prescription (Tr. 258), and later declined to restart it (Tr. 257). Dr. Lefkovitz once reported Plaintiff used more methadone than he was prescribed. (Tr. 375). Plaintiff failed to fill a prescription for a bladder infection (Tr. 258), declined physical therapy despite his complaints of shoulder pain (Tr. 239), and twice declined a recommended colonoscopy after having blood in his stool (Tr. 204,

239). Plaintiff was seen for progressive weight loss, but declined additional testing on two occasions. (Tr. 204, 199). Dr. Finizia referred Plaintiff to the Center for Families and Children to help him afford medications, but Plaintiff did not make an appointment. (Tr. 198). Plaintiff also did not keep a recommended appointment with a social worker (Tr. 199) or for scheduled blood work (Tr. 340). In addition, Plaintiff twice declined increasing his Nexium dosage to control epigastric pain (Tr. 199, 443), and declined a two-week trial at the higher dosage (Tr. 199).

Even if Plaintiff's persistent noncompliance were not enough to support the credibility determination, there is other record evidence further supporting it. Despite Plaintiff's allegations of disabling back pain, the x-rays in the record show only a mild degenerative change in Plaintiff's lumbar spine. (Tr. 316). Furthermore, as the ALJ said, the record indicates Plaintiff stopped working for reasons other than his alleged disability. In a December 2005 form Plaintiff filled out for SSA, he wrote "contractual job ended" in response to a question asking why he stopped working. (Tr. 151). Contrary to Plaintiff's arguments, these are not "spurious reasons" to dismiss Plaintiff's testimony; they are strong indicia of credibility issues. All of this certainly amounts to substantial evidence supporting the ALJ's adverse credibility determination. Therefore, it must be affirmed.

Treating Physician Rule

Plaintiff argues the ALJ erred in his treatment of Dr. Finizia's opinion. Generally, the medical opinions of treating physicians are accorded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings

16

alone,' their opinions are generally accorded more weight than those of non-treating physicians."
*Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given
"controlling weight" if supported by "medically acceptable clinical and laboratory diagnostic
techniques and is not inconsistent with other substantial evidence in the case record." *Id.*

The ALJ must give "good reasons" for the weight given to a treating source's opinion. *Id.*
The "good reasons" given by an ALJ to discount a treating source's opinion must be "supported by
the evidence in the case record". *Id.* at 406–407 (quoting SSR 96-2p, 1996 WL 374188, at *5). A
failure to follow this procedural requirement "denotes a lack of substantial evidence, even where the
conclusion of the ALJ may be justified based upon the record." *Id.* (citing *Rogers*, 486 F.3d at 243).
Accordingly, failure to give good reasons requires remand. *Id.* at 409–410.

Under the regulations, a "treating source" includes physicians, psychologists, or "other
acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and
who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502.
A medical provider is *not* considered a treating source if the claimant's relationship with them is
based solely on the claimant's need to obtain a report in support of their claim for disability. 20
C.F.R. § 404.1502.

With respect to Dr. Finizia, the ALJ found:

Dr. Finizia completed a medical source statement on June 11, 2007 and said that
[Plaintiff] carried diagnoses of low back pain, myalgias, bladder neoplasm, anxiety,
depression, fatty tumor, insomnia, and reflux disease. Dr. Finizia noted [Plaintiff]
could lift no more than five pounds and could sit, stand, and/or walk for less than an
hour in a normal workday. Dr. Finizia said [Plaintiff] was markedly limited with
pushing, pulling, bending, reaching, handling and repetitive foot movements. He said
his opinion was supported by "physical exam and discussion with patient." He went
on to say [Plaintiff] was "unemployable". I give little weight to Dr. Finizia's
opinions because they are not supported by the objective evidence or by his
treatment notes. As mentioned earlier, the objective evidence shows only mild

17

degenerative changes and does not support the extreme allegations of pain [Plaintiff] alleged. Likewise, while Dr. Finizia's examinations do reveal some spinal tenderness, there is little else to suggest [Plaintiff] would have any physical limitations. The treatment [Plaintiff] has received has been sporadic and Dr. Finizia's progress notes are filled with mentions of [Plaintiff's] noncompliance with treatment and medication. There is no suggestion in these records that back surgery has been recommended or is necessary. As such, I find that Dr. Finizia's opinions are not supported by the objective evidence or by his own examinations. In assigning weight to his opinions, I considered his status as [Plaintiff's] treating source with an ongoing relationship with [Plaintiff], but found that relationship outweighed by other factors. Finally, I give no weight to Dr. Finizia's opinion that [Plaintiff] is "unemployable" because such an opinion involved consideration of vocational issues that, as a doctor, Dr. [Finizia] was not qualified to deal with and because that opinion is on an issue that is reserved to the Commissioner[.]

(Tr. 21). On review, the ALJ properly evaluated Dr. Finizia's opinions and his conclusions about them are supported by substantial evidence.

As an initial matter, Plaintiff argues the ALJ should have addressed whether the impairments Dr. Finizia diagnosed were severe or not. This argument fails for the same reasons explained above; the step two determination is merely a threshold inquiry. *See Nejat*, 359 F. App'x at 576 (quoting SSR 96-8p, 1996 WL 374184, at *5); 20 C.F.R. § 404.1545(a)(2).   Dr. Finizia was unquestionably a treating source, having maintained an ongoing treatment relationship with Plaintiff over the course of several years. (Tr.  197–201, 254–256, 264–265, 268–273, 305–306, 307–308, 316, 330–341, 338–341, 384–387, 402–403, 411–412, 415, 420–421, 442–443). The ALJ's reasons for discounting his opinion, quoted above, are mainly that his opinions are not supported by the objective evidence or his own treatment notes. These have the support of substantial evidence in the record and constitute "good reasons". Plaintiff argues the lack of recommendation for back surgery should not be a fact supporting the weight given Dr. Finizia's opinion because Dr. Finizia was not treating Plaintiff for his back problems. As Dr. Finizia noted, a different physician was treating Plaintiff for pain management related to his back pain. (Tr. 271, 283, 305). Even disregarding this fact, there is

18

substantial support for the ALJ's good reasons to discount Dr. Finizia's opinions.

In June 2007, Dr. Finizia filled out forms describing Plaintiff's RFC. (Tr. 283–285). He noted Plaintiff's history of chronic low back pain, anxiety, depression, and a bladder neoplasm. (Tr. 283). Dr. Finizia reported Plaintiff can sit, stand, or walk for less than one hour in an eight-hour workday, can lift up to five pounds frequently or occasionally, and is markedly limited in his ability to bend, reach, handle, or do repetitive foot movements. (Tr. 284). Dr. Finizia deemed Plaintiff unemployable. (Tr. 284). He said the basis for these conclusions were his physical examinations and discussions with Plaintiff. (Tr. 284).

As Plaintiff acknowledges, whether Plaintiff is unemployable is an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1). As such, the ALJ rightly gave no "special significance" to Dr. Finizia's opinion on this issue. *See* 20 C.F.R. § 404.1527(d)(3). Beyond that, the record shows Dr. Finizia's restrictions are more severe than his own examinations indicate they should be, and more extreme than the objective medical evidence supports.

Dr. Finizia's examination notes are not significantly detailed, but consistently report mild findings, suggesting much less severe symptoms than his RFC accommodates for. They also show Plaintiff repeatedly refused treatment or evaluation for pain, further supporting the conclusion Plaintiff's pain is not as severe as Dr. Finizia's RFC implies. Certainly, they do not report physical findings consistent with severe, disabling symptoms. In July 2005, Dr. Finizia found only mild lumbar tenderness, no spasms, and normal muscle strength. (Tr. 385). In June 2006, Dr. Finizia reported "[s]ome improved control of pain" and on examination, he found a full range of motion, mild crepitus, no knee pain with patellar compression or apprehension, and no valgus or varus pain. (Tr. 336–337). The following month, when Plaintiff complained of continued knee pain, Dr. Finizia

19

found "[m]ild effusions bilaterally, no redness, [and] no warmth". (Tr. 338–339). In June 2007, Dr. Finizia noted some midline bony lumbar tenderness and paraspinal tenderness, but normal muscle tone, no edema, and mild abdominal tenderness. (Tr. 272).

In September 2007, Dr. Finizia examined Plaintiff's extremities after complaints of pain in Plaintiff's legs, and noted thigh tenderness but no redness, no swelling, and no masses. (Tr. 256). At that point, Dr. Finizia suggested an ultrasound, but the record does not indicate it was ever conducted. (Tr. 256). In February 2008, when Plaintiff complained of shoulder pain, Dr. Finizia found no evidence of dislocation and Plaintiff declined his referral to physical therapy. (Tr. 211–212). In August 2008, after complaints of whole-body pain, Dr. Finizia recommended changing Plaintiff's medication to control his epigastric pain, but Plaintiff declined. (Tr. 197–199). None of this is consistent with the severity of restrictions Dr. Finizia determined Plaintiff has.

Plaintiff argues the ALJ should not have omitted discussion of the fibromyalgia diagnosis Dr. Finizia at times mentioned. Fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers*, 486 F.3d at 244 n.3 (quoting *Stedman's Medical Dictionary for the Health Professions and Nursing* at 541 (5th ed. 2005)). Diagnosing fibromyalgia involves "observation of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and 'systematic' elimination of other diagnoses." *Rogers*, 486 F.3d at 244 (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)). CT scans, x-rays, and minor abnormalities "are not highly relevant in diagnosing [fibromyalgia] or its severity." *Id.; see also Preston*, 854 F.2d at 820. "[P]hysical examinations will usually yield normal results – a full range of motion, no join swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the

20

disease; rather it is a process of diagnosis by exclusion". *Id.* at 818. But there are no special rules for evaluating treating source opinions about fibromyalgia. *Cooper v. Astrue*, 2010 WL 5557448, at *4 (W.D. Ky. 2010). "As in any other case, the ALJ's decision must give 'good reasons' for the weight given to the treating physician's opinion." *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)). "The mere diagnosis of fibromyalgia, coupled with allegations of disabling subjective limitations, does not, *ipso facto*, require an ultimate finding of disability." *Id.* As the Sixth Circuit has said: "[A] diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits . . . . Some people may have a severe case of fibromyalgia as to be totally disabled from working but most do not and the question is whether claimant is one of the minority." *Vance v. Comm'r of Soc. Sec.*, 260 Fed. App'x 801, 806 (6th Cir. 2008) (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007); *Preston v. Sec'y of Health and Human Servs.*, 854 F.2d 815 (6th Cir. 1988)).

In this case, the mere fact Dr. Finizia mentioned Plaintiff has a prior diagnosis of fibromyalgia is irrelevant. It should be noted that at no point in the record did Dr. Finizia make the clinical findings (involving tender focal points) to support a diagnosis of fibromyalgia. In fact, his references to fibromyalgia merely say it was a "prev remote dx". (Tr. 340, 384). Nonetheless, even if Plaintiff has fibromyalgia, Dr. Finizia's treatment notes showing no more than mild recurrent pain do not at all suggest Plaintiff is "one of the minority" who is disabled from it. *See also Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 780 (6th Cir. 1987) ("although the physicians and psychologists diagnosed a severe, chronic condition, the examination results do not document functional debilitation"). The ALJ did not err in his treatment of Plaintiff's remote fibromyalgia diagnosis.

The objective medical evidence in the record tells the same story as Dr. Finizia's treatment

21

notes. Despite Dr. Finizia opining Plaintiff is markedly limited in his ability to reach, push, or pull, a March 2008 ultrasound of Plaintiff's shoulder revealed "no significant abnormality", including no fracture, dislocation, erosive or destructive changes, osteolytic or osteoblastic lesions, or pathological calcifications. (Tr. 215). Similarly, despite Dr. Finizia's opinion that Plaintiff can only sit, stand, or walk for less than an hour, an April 2006 lumbar spine x-ray revealed only a "[m]ild degenerative change within the lumbar spine". (Tr. 316). This supports the determination that Plaintiff's back pain is not so severe as to warrant Dr. Finizia's stark assessment of his physical RFC.

Additionally, Dr. Finizia's RFC was based, at least in part, on his discussions with Plaintiff. (Tr. 284). Because the ALJ's determination that Plaintiff's statements regarding his symptoms are not fully credible is supported by substantial evidence, this serves as yet another reason to discount the RFC assessment of Dr. Finizia. Plus, both of medical consultant Dr. Holbrook's physical RFC assessments – later affirmed by consultant Dr. Cho (Tr. 296) – further support symptoms of lesser severity than Dr. Finizia opined. Dr. Holbrook determined Plaintiff could lift ten pounds frequently, 20 pounds occasionally, and could sit, stand, or walk for about six hours in an eight-hour workday. (Tr. 225, 349). In making these determinations, Dr. Holbrook relied in part on Plaintiff declining physical therapy and examination notes showing 5/5 strength, intact sensation, no evidence of recurrent dislocation in his shoulder, normal muscle tone, and no spasms. (Tr. 225–226, 349). Even though the ALJ ultimately gave "no weight" to Dr. Holbrook's opinions with the exception of his no climbing restriction (Tr. 20–21), they still serve to show in part that Dr. Finizia's opinion is inconsistent with other medical evidence in the record. In sum, substantial evidence in the record supports the ALJ's "good reasons" for discounting Dr. Finizia's opinions, and he did not err in doing

22

so.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision denying benefits supported by substantial evidence. Therefore, the Commissioner's decision is affirmed.

IT IS SO ORDERED.

_____s/James R. Knepp, II_____
United States Magistrate Judge
